**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

October 3, 2023

# In the Court of Appeals of Georgia

A23A0796. SWARN v. THOMPSON, COMMISSIONER, GEORGIA DEPARTMENT OF LABOR.

DILLARD, Presiding Judge.

In late 2020, Marquesa Swarn applied for federally funded Pandemic Unemployment Assistance ("PUA")[1] through the Georgia Department of Labor, claiming the COVID-19 pandemic detrimentally affected her employment. Following an administrative hearing, a hearing officer denied her request, and the Department's Board of Review affirmed that decision. Swarn then filed a petition for judicial review in the Superior Court of Fulton County, which also affirmed the denial. Undeterred, Swarn filed an application for discretionary appeal with this Court, which we granted. Specifically, Swarn contends the superior court erred in affirming the Department's

---

[1] *See generally* 15 U.S.C. § 9021.

decision that she was unemployed for reasons not directly related to the COVID-19 pandemic. We agree and, thus, reverse that decision.

Judicial review of an administrative decision requires this Court to determine that "the findings of fact are supported by 'any evidence' and examine the soundness of the conclusions of law that are based upon the findings of fact."[2] And when we review a superior court's order in an administrative proceeding, our duty is "not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency."[3] Importantly, we review legal conclusions *de novo*.[4]

So viewed, the record shows that, beginning in October 2019, Swarn—who was 64 years old at the time—was self-employed. Specifically, she provided childcare services out of her own home, taking care of her daughter's children and the children of another family. She also provided translation services to individuals in need of a

---

[2] *Butler v. Butler*, 363 Ga. App. 280, 281 (870 SE2d 857) (2022) (punctuation omitted); *accord Hudson v. Butler*, 337 Ga. App. 207, 207 (786 SE2d 879) (2016).

[3] *Butler*, 363 Ga. App. at 281 (punctuation omitted); *accord Hudson*, 337 Ga. App. at 207.

[4] *See Butler*, 363 Ga. App. at 281 (punctuation omitted); *accord Hudson*, 337 Ga. App. at 207.

Spanish-English interpreter, often accompanying her Spanish-speaking clients to places of business where only English was spoken—such as doctors' offices.

In March 2020, the COVID-19 pandemic resulted in Swarn being unable to maintain either of her means of self-employment. Her daughter no longer wanted Swarn to provide her with childcare due to the risk of Swarn and the children's exposure to the illness. In addition, Swarn's work as a translator ceased because many of the businesses where she accompanied her clients shut down and it was no longer safe to be physically present with those clients.

Given her situation, on April 12, 2020, Swarn filed a Georgia unemployment insurance claim, which was denied. Subsequently, on September 11, 2020, she applied for PUA benefits, claiming her unemployment began on March 29, 2020. Her request was denied on November 4, 2020, based on the Department's determination that her unemployment was not a direct result of the public health emergency. Swarn then filed a timely appeal, and on January 21, 2021, an administrative hearing officer with the Department conducted an evidentiary hearing by telephone, in which Swarn proceeded *pro se*.

On January 24, 2022, the hearing officer issued an order denying Swarn's claim, finding that she "stopped working due to her concerns related to the COVID-19 pandemic" rather than one of the reasons outlined in the applicable federal statute As a result, the hearing officer determined Swarn was ineligible for PUA benefits. Swarn timely appealed to the Board of Review, but on March 8, 2022, the Board affirmed the hearing officer's decision; and one month later, it denied Swarn's motion for reconsideration.

Thereafter, and now represented by counsel, Swarn filed a petition for judicial review of the Board's decision in the superior court. The court heard oral argument on the matter, and on October 31, 2022, it issued a final order, affirming the Board's decision. Swarn then filed an application for discretionary appeal, which we granted. This appeal follows.

In her sole enumeration of error, Swarn contends the superior court erred in affirming the Department's decision that she was unemployed for reasons not directly related to the COVID-19 pandemic and, thus, ineligible for PUA benefits under the applicable federal statute. We agree and reverse.

Tasked with interpreting statutory language, we necessarily begin our analysis with "familiar and binding canons of construction."[5] In considering the meaning of a statute, our charge as an appellate court is to "presume that the [legislative body] meant what it said and said what it meant."[6] And toward that end, we must afford the statutory text its plain and ordinary meaning,[7] consider the text contextually,[8] read the

---

[5] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[6] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 517 (1).

[7] *See Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text." (punctuation and citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies). . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning. . . ." (punctuation omitted)).

[8] *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *accord Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012); *Holcomb*, 329 Ga. App. at 517 (1); *see also Tibbles*, 297 Ga. at 558(1) ("The common and

text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[9] and seek to "avoid a construction that makes some language mere surplusage."[10] In sum, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[11]

Turning to the statute at issue, in March 2020, shortly after it became apparent the COVID-19 pandemic posed a serious threat to the country's public health and economy, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").[12] And to effectuate the *codified* purpose of the CARES Act, President Biden subsequently directed administrative agencies by executive order to

---

customary usages of the words are important, but so is their context.") (punctuation and citation omitted); *Chan*, 296 Ga. at 839 (1) (same).

[9] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb*, 329 Ga. App. at 518 (1).

[10] *In the Interest of L.T.*, 325 Ga. App. at 592 (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1).

[11] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

[12] *See* Pub. L. No. 116-136, 134 Stat. 281, codified at 15 U.S.C. § 9021 (2020).

"specifically consider actions that . . . improve access to, reduce unnecessary barriers to, and improve coordination among programs funded . . . by the Federal Government . . . [and] should prioritize actions that provide the greatest relief to individuals . . . ."[13] Toward that end, Section 9021 of the CARES Act established the PUA, which provided benefits assistance to individuals who lost work or were unable to work because of the pandemic,[14] and which was to be administered by the states.[15] PUA benefits were available from January 27, 2020, to September 6, 2021,[16] and the program notably expanded eligibility for unemployment benefits to workers who would not otherwise qualify.[17]

---

[13] *See* Exec. Order No. 14002, Fed. Reg. 7229 (Jan. 22, 2021), reprinted in 15 U.S.C.A. § 9001, 86, Sec. 2, (a)-(b).

[14] *See* 15 U.S.C. § 9021.

[15] *See generally* 15 U.S.C. § 9029 (outlining the Secretary of Labor's guidance to the states for implementation).

[16] *See* 15 U.S.C. § 9021 (c) (1) (A) (i) and (ii).

[17] *See* 15 U.S.C. § 9021 (a) (3) (A) (i) ("The term 'covered individual' means an individual who is not eligible for regular compensation or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 9025 of this title, including an individual who has exhausted all rights to regular unemployment or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 9025 of this title . . . .").

Under the provisions of the statute, PUA was available only to individuals who were ineligible for regular unemployment and self-certified to being "otherwise able to work and available for work . . . except [they were] unemployed, partially unemployed, or unable or unavailable to work" for one of eleven reasons enumerated in the statute.[18] Included among these reasons—and relevant here—was a statutory provision providing, "the individual's place of employment is closed as a direct result of the COVID-19 public health emergency,"[19] as well as a catch-all provision providing, "the individual meets any additional criteria established by the Secretary for unemployment assistance under this section[.]"[20] And as to this catch-all provision, in a United States Department of Labor ("USDOL") letter distributed to the states to provide updates and guidance regarding administration of the program (and which was, importantly, authorized by statute), the USDOL described individuals who qualified for assistance.[21] Specifically, the letter explained that

---

[18] 15 U.S.C. § 9021 (a) (3) (A) (i) and (ii) (I) (aa)-(kk).

[19] 15 U.S.C. § 9021 (a) (3) (A) (ii) (I) (jj).

[20] 15 U.S.C. § 9021 (a) (3) (A) (ii) (I) (kk).

[21] *See* U.S. Dep't of Labor, Unemployment Insurance Program Letter No. 16-20, Change 2, 1-6 (July 21, 2020); *see also* 15 U.S.C.A. § 9032 (b) ("Notwithstanding any other provision of law, the Secretary of Labor may issue any

independent contractors who do not have a traditional "place of employment," such as a driver for a ride-sharing service—who may not qualify for benefits under the other statutory criteria—may still do so if "she has been forced to suspend operations as a direct result of the COVID-19 public health emergency[.]"[22]

With this statutory and administrative backdrop in mind, we return to Swarn's arguments. And importantly, during the administrative hearing, she testified that her daughter stopped allowing her to provide childcare for her children shortly after the outbreak of the pandemic—albeit acknowledging that she did not disagree with this decision.[23] Swarn further testified that she also stopped working as a translator because the businesses to which she accompanied clients were not operating, or as she described it: "All of that shut down." Even so, apparently focusing on Swarn's testimony that she had underlying health conditions that would be "real bad" if she

---

operating instructions or other guidance necessary to carry out the provisions of, or the amendments made by, this subtitle.").

[22] *See* U.S. Dep't of Labor, Unemployment Insurance Program Letter No. 16-20, Change 2, 1-6 (July 21, 2020).

[23] For whatever reason, there is no questioning or testimony in the appellate record concerning Swarn's apparent cessation of providing childcare services to the other family's children.

became ill, the hearing officer determined she was not eligible for PUA benefits because she ceased working due to general concerns related to COVID-19, rather than because of an approved statutory reason. We disagree with the hearing officer's determination.

Although we acknowledge "general concerns about exposure to COVID-19" do not qualify as one of the reasons for eligibility listed in the statute,[24] we do not agree Swarn's admission that she feared being exposed to the virus—a perfectly reasonable fear shared by many of her fellow Americans at that time—amounted to a contradiction that her sources of employment were effectively halted by the public health emergency addressed by 15 U.S.C. § 9021 (a) (3) (A) (ii) (I) (jj) and (kk). And nothing in the record indicates the hearing officer found Swarn's testimony lacked credibility. Accordingly, for all of the foregoing reasons, we find the superior court erred by affirming the Board's ruling that Swarn was not eligible for PUA benefits

---

[24] *See* U.S. Dep't of Labor, Unemployment Insurance Program Letter No. 16-20, Change 1, 1-10 (April 27, 2020).

because, under the plain meaning of the applicable federal statute, her *uncontested* evidence was sufficient.[25] So, we reverse that ruling.

*Judgment reversed. Rickman and Pipkin, JJ., concur.*

---

[25] *See Popal v. Emp. Sec. Div.*, 518 P3d 879 (Table) (2022 WL 12455235) *4-5 (Nev. Ct. of App. 2022) (reversing decision denying claim given that claimant self-certified that the basis for his PUA eligibility was that his individual place of business was closed as a result of the pandemic and no finding in record that his testimony lacked credibility); *Simmons v. Arizona Dep't of Econ. Sec.*, 518 P3d 769, 772-73 (Ariz. Ct. of App. 2022) (reversing Board's denial of claim given that ALJ made no finding that claimant's testimony was not credible, claimant's uncontested evidence was sufficient to establish that he became unemployed as direct result of COVID-19, as enumerated reason for eligibility for PUA under 15 U.S.C. § 9021 (a) (3) (A) (ii) (I)).